# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**IN RE TECO ENERGY, INC.**       **Case No. 8:04-CV-1948-T-27EAJ**
**SECURITIES LITIGATION,**
_____/

## <u>ORDER</u>

**BEFORE THE COURT** is Defendants' Second Motion to Dismiss and incorporated memorandum of law (Dkt. 100), to which Plaintiffs have responded in opposition (Dkt. 101). Upon consideration, Defendants' Motion to Dismiss is granted in part.

### *Procedural History*

Plaintiffs are NECA-IBEW Pension Fund, Monroe County Employees Retirement System, John Marder, and Charles Korpak, individually and on behalf of a proposed class of persons who purchased publicly traded securities of TECO between October 30, 2001 and February 4, 2003. (Dkt. 90, ¶¶ 1, 16). TECO, based in Tampa, Florida, is a public utility holding company for its regulated operating subsidiary, Tampa Electric Company, and other non-regulated subsidiaries. (Dkt. 90, ¶ 17). Defendant Robert D. Fagan is former Chief Executive Officer and President of TECO and Chairman of TECO's Board of Directors. (Dkt. 90, ¶ 18). Defendant Gordon L. Gillette is TECO's former Chief Financial Officer. (Dkt. 90, ¶ 19).

Plaintiffs filed a Consolidated Class Action Complaint alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder

1

against all Defendants and Section 20(a) of the Exchange Act against the individual Defendants.[1] (Dkt. 59, Compl., ¶ 1). Specifically, Plaintiffs claim that Defendants engaged in a fraudulent scheme to artificially inflate TECO's stock price by misrepresenting its financial condition. Defendants previously moved to dismiss the Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6) based on Plaintiffs' failure to plead loss causation and failure to state a fraud claim under Section 10(b). (Dkt. 64). That motion was granted in part, as Plaintiffs failed to adequately plead loss causation. The motion was denied as to the remainder of Plaintiff's Section 10(b) claim. (Dkt. 86). Plaintiffs filed an 191-page Amended Complaint (Dkt. 90), to which Defendants responded with the instant motion to dismiss, again arguing that Plaintiffs have failed to adequately plead loss causation.

### *Factual Background*

Plaintiffs allege that TECO's historical strategy of steady growth and calculated, controlled risk abruptly changed with the installation of Mr. Fagan as TECO's CEO in April 1999. (Dkt. 90, ¶¶ 5-6). Under the leadership of Mr. Fagan, Plaintiffs allege that TECO's subsidiaries moved quickly and aggressively into the wholesale power market. (Dkt. 90, ¶ 6). For instance, Plaintiffs allege that in 1999 and early 2000, TPS started construction or opened eleven new or expanded power generation facilities in Costa Rica, Guatemala, Texas, Central Florida, Hawaii, and Virginia. (Dkt. 90, ¶ 6).

Plaintiffs allege that as the stock of other energy companies began to plummet in 2002, TECO's stock remained at artificially high prices due to Defendants' misrepresentations and

---

[1] Section 10(b) of the Exchange Act prohibits the use or employment of any manipulative or deceptive device in connection with the purchase or sale of any security in contravention of Securities Exchange Commission rules and regulations. 15 U.S.C. § 78j(b). Rule 10b-5 prohibits the making of any "untrue statement of a material fact" or the omission of a material fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. Pursuant to Section 20(a) of the Exchange Act, liability may be imposed on a "controlling person" where a securities violation is found. 15 U.S.C. § 78t(a); *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 395-97 (11th Cir. 1996).

omissions regarding TECO's: (1) possession of merchant power contracts; (2) access to transmission; (3) exposure to the debt of its corporate partners; (4) exposure to Enron's collapse; and (5) commitment to maintaining its dividends.  (Dkt. 90, ¶ 300-301, 303). Plaintiffs allege that TECO's true financial condition began to leak out to the market in August 2002, through statements in a series of analyst reports, ratings, and news articles.  (Dkt. 90, ¶¶ 305, 311, 313, 319-20).

Defendants contend that these reports disclosed no fraud and that TECO's SEC filings and press releases repeatedly warned the market that the profitability of its plants would depend on future power prices and its ability to construct and operate projects on schedule and within budget, among other factors.  (Dkt. 100, p. 3-4; App. A, Exh. 2-9).

***Defendants' Alleged Misrepresentations and Omissions***

Plaintiffs allege that Defendants made numerous misrepresentations and omissions, although Plaintiffs have made no materially different allegations in the Amended Complaint.  In summary, Plaintiffs allege fraudulent statements and omissions on the following subjects:

*1. Merchant power contracts*

Plaintiffs allege that a December 3, 2001 Wall Street Journal article quoted Mr. Fagan as stating:

> We have about 6,000 megawatts outside of Florida, and those are the plants that are in construction and will be coming into operation late next year.  The biggest thing we can do at this time is to secure our customers for the output from those plants. Those plants are being built in markets that have high growth rates and have the need for additional capacity.  We're positioning ourselves through a number of long-term contracts, as well as intermediate and short-term contracts, to take advantage of those markets.  So what we're looking to do now is place the power from those plants that are under construction.  (Dkt. 90, ¶ 170).

Plaintiffs allege that a September 9, 2002 TECO press release quoted Mr. Fagan as follows:

Our major generating projects at TPS do not begin operating until next year, and we

are continuing to work diligently to secure power contracts for a material portion of those projects. I'm happy to report that we already have contracts in place for portions of the output in each of the regions we will serve, including Texas, Arizona and the Entergy region. (Dkt. 90, ¶ 216).

Plaintiffs allege that TECO stated in a September 23, 2002 press release:

The company expects to continue putting contracts in place for portions of the output of its Arizona, Texas and the Entergy region projects, which would reduce potential volatility in earnings and cash flow for these projects in 2003, with the goal of having at least 40 percent of its combined merchant output (Union, Gila River, and Frontera power stations) hedged by the end of 2002. . . . (Dkt. 90, ¶ 218).

Plaintiffs allege that during a September 25, 2002 conference call,[2] Mr. Fagan stated:

The last challenge I mentioned earlier was to deal with the projected low power prices for 2003. Let me tell you, TPS has been very busy addressing this issue. In addition to suspending construction at Dell [&] McAdams, TPS has been hedging output for the plants in Texas, Arizona, and the Entergy region. Dell continue[s] to increase the amount hedged as market permits. Our goal is to have 40% of combined output hedged by the end of the year. At the same time, we are talking to potential purchasers and have good prospects for longer term contracts. (Dkt. 90, ¶¶ 222).

Finally, Plaintiffs allege that TECO failed to disclose that it did not "secure anywhere near the amount of power sales agreements necessary to make the Union & Gila River plants commercially viable," and that TECO's subsidiary, TPS, avoided signing long-term contracts to stay away from agreements that would require FAS 133 accounting. (Dkt. 90, ¶¶ 116-119).

*2. Transmission access*

Plaintiffs allege that TECO failed to disclose the results of pre-construction due diligence reports on the Gila River, Union, McAdams, and Dell projects, which allegedly reported that the projects had "no transmission capacity." (Dkt. 90, ¶ 89). Plaintiffs allege that "TECO representatives

---

[2] The Court notes that the Reform Act provides that when "an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." § 78u-4(b)(1); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1189-90 (10th Cir. 2003) (requiring plaintiffs to state their allegations with particularity with respect to conferences call at which they were not present).

knew or should have known that there might be access problems" at Union and Gila River because the plants were located in the competitive territories of Entergy and Arizona Public Service. (Dkt. 90, ¶ 102).

Plaintiffs allege that the September 23, 2002 TECO press release described the transmission capabilities of the Gila Rive and Union plants as follows:

> The Gila River Power station plants to compete to serve the load, which will include transmission capacity, that will be put up for bid in Mach 2003 under Arizona's competitive bidding process. In addition, TPS has or has applied for firm transmission service for more than 1,800 megawatts of capacity, which will ensure power can move to customers.
>
> Union Power Station expects to secure short-term transmission capacity, as is customary, for sales within the Entergy region, and it is currently pursuing firm transmission options for sales outside of the region.

During the September 25, 2003 conference call, Plaintiffs allege that Mr. Fagan also stated, "Yes we do have transmission access to the market in Arizona. . . ." (Dkt. 90, ¶ 223).

*3. Exposure to Panda's debt*

In November 2000, TECO entered into a joint venture for its Gila River and Union projects with Panda Energy International, a closely held company headquartered in Texas. (Dkt. 90, ¶ 62, 73). TECO represented that it would provide interim loans totaling $370 million for the projects. (Dkt. 90, ¶ 73). In September 2000, TECO also announced that it had made a $93 million "investment in the form of a loan" to Panda in connection with Panda's Odessa and Guadalupe projects (or "TIE projects") in Texas. (Dkt. 90, ¶ 72).

Plaintiffs allege that "unbeknownst to TECO's shareholders, Panda also negotiated a buyout provision that allowed it to 'put' the projects on TECO – Panda had the option of walking away from the projects, without any liability for potential losses, and literally burying TECO with all the debt."

5

(Dkt. 90, ¶ 68).

*4. Exposure to Enron's collapse*

Plaintiffs allege that TECO "began to develop a scheme to distance itself from Enron to the greatest extent possible," and that TECO executives decided to report only $60 million of exposure, rather than the true number of $150 million. (Dkt. 90, ¶¶ 125, 139-140).

*5. Ability to maintain dividends*

Plaintiffs allege that TECO repeatedly – and falsely – stated that it was dedicated to maintaining its dividend. (Dkt. 90, ¶¶ 216, 221, 314-15).[3]

**Alleged Corrective Disclosures**

Plaintiffs allege that TECO's multiple misrepresentations and omissions, when "revealed," caused a 44% decline in TECO's stock, from $24.27 on August 12, 2002 to $12.78 by February 4, 2003. (Dkt. 90, ¶ 213, 251). The Amended Complaint refers to new analyst reports and incorporates language from previously cited reports. (Dkt. 90, ¶¶ 205-215). Specifically, Plaintiffs now allege: (1) on August 12, 2002, A.G. Edwards cut its rating of TECO to "sell" from "hold;" (2) on August 13, 2002, UBS Warburg cut earnings estimates, "citing an absence of long-term contracts;" and (3) on August 16, 2002, Gerard Klauer downgraded TECO to "underperform" from "neutral." (Dkt. 90, ¶ 205). Plaintiffs allege that the stock prices declined 9% on August 13, 2002 and 4% on August 16, 2002. (Dkt. 90, ¶ 213).

---

[3] In a September 9, 2002 press release TECO stated: "We remain completely dedicated to doing the right things for our shareholders in these challenging times, including maintaining the dividend." (Dkt. 90, ¶ 216); During the September 25, 2002 conference call, Mr. Fagan stated: "[T]he plan we are discussing today includes maintaining our dividend for next year" (Dkt. 90, ¶ 221); In an October 16, 2002 press release, TECO stated: "As we've said previously, our business plan includes maintaining our dividend in 2003" (Dkt. 90, ¶ 314); In a November 9, 2002 Tampa Tribune article, a TECO spokeswoman was attributed as saying that TECO would maintain its dividend. (Dkt. 90, ¶ 315).

On September 3, 2002, CSFB cut TECO's rating to "sell" stating that "it is not clear if TE has secured any transmission access in [Arizona]" and that TECO "has failed to secure any power sales contracts or other hedges for the outputs from its domestic projects."  (Dkt. 90, ¶ 207). Plaintiffs also cite portions of two other analyst reports, which emphasize that the loans to Panda, on which TPS was recording interest income, would come due in 2003 and be converted into ownership interest into plants that were currently not profitable (Dkt. 90, ¶¶ 209-211). One of these reports, by Jeffries & Company, Inc., also stated: "TPS will be exposed to fluctuations in wholesale power prices in 2003 as a result of its long un-hedged generation portfolio.  By the end of 2003, the company will have a total of 6,575 MW of generation online, of which all but 595 is un-hedged." (Dkt. 90, ¶ 209).

Plaintiffs allege that TECO's stock prices declined 18% on September 3, 2002, and another 5% on September 9, 2002, after Moody's placed TECO's debt ratings on review for possible downgrade.  (Dkt. 90, ¶¶ 213-14).

Plaintiffs also cite to analyst reports from September 23, 2002, October 8, 2002, and January 24, 2003, but make no materially new allegations regarding the content of these reports.  Plaintiffs have included a new allegation that TECO's stock price dropped 3.6% following the September 23, 2002 report (Dkt. 90, ¶ 219); 10% following the October 8, 2002 report (¶ 231); and 4.5% following the January 24, 2003 report (¶ 248).

Although TECO had increased its dividend for forty-three consecutive years (Dkt. 90, ¶ 301), on April 11, 2003, TECO announced a dividend cut of 46% (¶ 324).  Following this announcement, TECO's stock increased 5%.  (Dkt. 90, ¶ 324).

### *Applicable Standards*

A court may grant a motion to dismiss "only when the defendant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004) (*internal quotation and citation omitted*).  The court will accept as true the factual allegations in the complaint and will view them in a light most favorable to the nonmoving party.  *Id.*

To state a cause of action under Section 10(b) or Rule 10b-5, plaintiffs are required to allege: (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss.  *Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir. 2001) (*citation omitted*).  Loss causation is not subject to the PSLRA's heightened pleading requirement and must only be plead in accordance with Fed. R. Civ. P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (assuming that Rule 8(a) applies to the pleading of loss causation).  Notwithstanding, "the short and plain statement must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Id.* (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (*internal quotations omitted*).  The PSLRA did not alter the required presumption that the court "give Plaintiffs, not Defendants, the benefit of every favorable inference that can be drawn from their allegations."  *In re Sykes Enters., Inc.*, No. 8:00-CV-212, 2001 WL 964160, at *2 (M.D. Fla. Mar. 7, 2001) (*citations omitted*).

### *Discussion*

Pursuant to the PSLRA, a plaintiff has the burden of proving that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); *Dura Pharms., Inc.*, 544 U.S. at 345-46.  Loss causation may not be established by simply

alleging that a stock was purchased at an artificially inflated price. *Dura Pharms., Inc.*, 544 U.S. at 346-47. Rather, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop. *Id.* at 347; *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2nd Cir. 2005); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997).

When plaintiffs fail to allege that a corrective disclosure revealed a misrepresentation or omission, a motion to dismiss is appropriate.[4] These inquiries are fact-specific and frequently employ a step-by-step approach, examining each alleged corrective disclosure for reference to previous misrepresentations and omissions. *See D.E.&J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994, 1000 (6th Cir. 2005) (allegation that stock price dropped immediately following company's bankruptcy filing was insufficient because there was no allegation that the bankruptcy announcement disclosed any prior misrepresentations to the market); *Lentell*, 396 F.3d at 175 n.4 (analyst downgrade of stock from "accumulate" to "neutral" and from "buy" to "sell" was not a corrective disclosure because it did not reveal to the market the falsity of prior recommendations)*; In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (plaintiffs failed to allege loss causation where the reports stating that company would fail to meet revenue forecasts never disclosed defendants' alleged scheme); *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1380 (N.D. Ga. 2004) (press release announcing lower earnings and rating downgrade did not discuss the subject matter of the alleged fraud).[5] Conversely, in those cases in which courts have found that

[4] Although *Dura* rejected the Ninth Circuit's lenient test for loss causation, it left intact the more stringent requirements found in the Second, Third, Seventh, and Eleventh Circuits. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, H-01-3624, 2005 U.S. Dist. LEXIS 41240 *63 (S.D.Tex. Dec. 22, 2005) (*citing* Robbins, 116 F.3d at 1447-48).

[5] *See also Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243, 244-45 (S.D.N.Y. 2006); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 862-63 (N.D.Tex. 2005); *In re Cree, Inc. Sec. Litig.*, 1:03cv00549, 2005 U.S. Dis. LEXIS 21975 **39-41 (M.D.N.C. Aug. 2, 2005); *In re Merrill Lynch Tyco Research Sec. Litig.*, 03-cv-4080(MP), 2004 WL

there were sufficient allegations of loss causation, the corrective disclosures specifically mentioned an alleged misrepresentation.[6]

In cases involving allegedly fraudulent omissions, courts have at times not required a specific "corrective disclosure," but have required adequate allegations of "materialization of the concealed risk."  In other words, the risk that is allegedly concealed through a defendant's omissions must materialize in a foreseeable manner.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) (the risk that company had massive undisclosed debt that was allegedly concealed by false analyst report materialized when company was unable to pay bonds when they became due, trading was suspended by regulators, and shares lost half their value when trading resumed); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, *12 (S.D.N.Y. 2005) (finding that the concealment that collateral pool had a substantial number of high risk loans materialized when the pool experienced high delinquency rates and repossession on a sustained basis, the company's earning expectations fell, it announced it would write off the losses, and rating agencies downgraded the certificates); *see also Croker v. Carrier Access Corp.*, 05 civ.

---

305809 (S.D.N.Y. Feb. 18, 2004); *In re Premiere Tech.*, 1:98-cv-1804-JOF, 2000 WL 33231639 (N.D. Ga. Dec. 8, 2000).

[6] *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (complaint alleged: "Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables - the direct result of prematurely recognizing revenue" and that prior to this disclosure "defendants failed to disclose the actual figures to analysts to conceal the fact that Daou's operating earnings and margins were deteriorating as a result of prematurely and improperly recognizing revenue"); *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 827-28 (D.N.J. 2006) (finding that the truth about a sham transaction was revealed through a series of disclosing events, commencing with a press release announcing an SEC investigation that requested documents pertaining to revenue recognition and capitalization of payments); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D.Mass. 2006) (complaint alleged that news of an SEC investigation relating to defendants' misleading statements "shocked the market, with shares falling 17.13%"); *In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728, 737 (M.D. Tenn. 2006) (complaint alleged that share price fell as the severity of the problems with the company's ATX tires surfaced, and the "previously undisclosed information directly contradicted the purported truth" of the company's previous statements); *City of Sterling Heights Pol. And Fire Ret. Sys. V. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 357 (S.D.N.Y. 2006) (defendants' announcement that it would have substantially lower profits and massive write-offs and provisioning due to exposure to telecoms and cable sectors, including Tyco's collapse, adequately disclosed prior misrepresentations that there were no problems with its portfolio).

01011, 2006 U.S. Dist. LEXIS *21 (S.D.N.Y. July 18, 2006) (company's material failure to disclose

that it missed its product delivery deadline was revealed by the passing of the deadline without the

promised event).

The cases cited above each contain some type of tangible event, or events, that adversely

affected the stock price.  In corrective disclosure cases, the medium of reporting – whether

announcement of an SEC investigation, the company's own disclosure, or less formal reports by

newspapers or internet websites – specifically revealed the alleged fraud.  In materialization of risk

cases, events such as suspended trading, announcement of write-offs, and issuance of revised

earnings figures were the material and foreseeable consequence of the defendants' omissions.

With these standards in mind, the Court finds that Plaintiffs have, by a narrow margin,

adequately pled loss causation only as to the portion of their claim dealing with TECO's merchant

power contracts.

*1. Merchant power contracts*

In new allegations, Plaintiffs allege that the August 13, 2002 UBS report cut earnings

estimates, "citing an absence of long-term contracts."  (Dkt. 90, ¶ 205).  The UBS report states in

full:

> Factoring in the prevailing uncertainty surrounding the '03 earnings stream from
> TECO's Power Services (due to the absence of long-term contracts supporting
> merchant plants coming on-line next year) and the lack of visibility in spark spreads
> today as a result of the collapse among energy merchants (whose void has not been
> filled in the marketplace), we are trimming our '03 EPS estimate to $2.15 from
> $2.40. (Dkt. 90, Exh. 18).

Similarly, Plaintiffs now allege that the September 3, 2002 CFSB report stated: "To date, [TE] has

failed to secure any power sales contracts or other hedges for the output from any of its domestic

projects."[7]  (Dkt. 90, ¶ 207; Dkt. 90, Exh. 14).   Finally, Plaintiffs allege that the September 3, 2002

Jeffries report stated: "TPS will be exposed to fluctuations in wholesale power prices in 2003 as a

result of its long un-hedged generation portfolio.  By the end of 2003, the company will have a total

of 6,575 MW of generation online, of which all but 595 is un-hedged."[8]  (Dkt. 90, ¶ 209).

In addition, Plaintiffs have adequately pled that the stock price fell following the disclosures:

9% on August 13, 2002; 4% on August 16, 2002 (Dkt. 90, ¶ 213); and 18% on September 3, 2002

(Dkt. 90, ¶ 213).

Plaintiffs allege that these statements contradict the following December 3, 2001 statement

by Mr. Fagan:

> We have about 6,000 megawatts outside of Florida, and those are the plants that are
> in construction and will be coming into operation late next year.  The biggest thing
> we can do at this time is to secure our customers for the output from those plants.
> Those plants are being built in markets that have high growth rates and have the need
> for additional capacity.  *We're positioning ourselves through a number of long-*
> *term contracts*, as well as intermediate and short-term contracts, to take advantage
> of those markets.  So what we're looking to do now is place the power from those
> plants that are under construction.  (Dkt. 90, ¶ 170).

Plaintiffs also allege TECO made the following misrepresentations concerning contracts,

after the alleged corrective disclosures on August 13, 2002 and September 3, 2002:

On September 9, 2002:

> Our major generating projects a TPS do not begin operating until next year, and we
> are continuing to work diligently to secure power contracts for a material portion of
> those projects.  *I'm happy to report that we already have contracts in place for*
> *portions of the output in each of the regions we will serve, including Texas,*
> *Arizona and the Entergy region.*  (Dkt. 90, ¶ 216).

---

[7] The report earlier states that "TE has failed to secure any power sales contracts for the output from its *new*
domestic projects."  (Dkt. 90, Exh. 18).

[8] Plaintiff also cites to, but does not include language from, the August 16, 2002 Gerard Klauer report, which states:
"Our lower rating reflects the uncertainties associated with about 4,450 Ms of new capacity coming into commercial
operation late this year and into mid-2003, that is generally unhedged."  (Dkt. 97, Exh. 19).

On September 23, 2002:

> ***The company expects to continue putting contracts in place for portions of the output of its Arizona, Texas and the Entergy region projects***, which would reduce potential volatility in earnings and cash flow for these projects in 2003, with the goal of having at least 40 percent of its combined merchant output (Union, Gila River, and Frontera power stations) hedged by the end of 2002. . . . (Dkt. 90, ¶ 218)

On September 25, 2003:

> ***In addition to suspending construction at Dell [&] McAdams, TPS has been hedging output for the plants in Texas, Arizona, and the Entergy region.*** Dell continue[s] to increase the amount hedged as market permits. Our goal is to have 40% of combined output hedged by the end of the year. ***At the same time, we are talking to potential purchasers and have good prospects for longer term contracts.*** (Dkt. 90, ¶¶ 222).

However, Plaintiffs have alleged no corrective disclosures as to the latter three statements. None of the analyst reports or news articles contradict these statements. As such, it is not apparent from the face of the Amended Complaint how stock prices fell "after the truth became known." *Dura Pharm. Inc.*, 544 U.S. at 347.

The question remains as to whether Plaintiffs have adequately alleged loss causation in light of Mr. Fagan's December 3, 2001 statement that was allegedly corrected by the August 13, 2002 and September 3, 2002 reports. The Court notes that Mr. Fagan's statement is couched in prospective terms:

> ***The biggest thing we can do at this time is to secure our customers for the output from those plants.*** Those plants are being built in markets that have high growth rates and have the need for additional capacity. We're positioning ourselves through a number of long-term contracts, as well as intermediate and short-term contracts, to take advantage of those markets. ***So what we're looking to do now is place the power from those plants that are under construction.*** (Dkt. 90, ¶ 170). [9]

---

[9] Plaintiffs repeatedly allege that TECO's motive for not entering into long-term contracts was to avoid FAS 133 accounting. Although the Court accepts this allegation as true for the purposes of this motion to dismiss, it is not clear how TECO's motive is relevant for loss causation purposes. Rather, the inquiry focuses on whether a misrepresentation or omission was revealed that caused a drop in the stock price.

The Court also notes that there is conflict among the analyst reports themselves: the August 13, 2002 UBS report refers to an "absence of long-term contracts supporting merchant plants coming on-line;" the September 3, 2002 UBS report unequivocally states that TECO "failed to secure any power sales contracts or other hedges for the output from any of its domestic projects;" while the September 3, 2002 Jeffries report states that "by the end of 2003, the company will have a total of 6,575 MW of generation online, of which all but 595 is un-hedged." Finally, it is puzzling that while TECO made repeated statements that it secured contracts after the analyst reports were issued, there is no allegation that the truthfulness of these statements was ever called into question.

Notwithstanding, given the liberal notice pleading standard of the Federal Rules, which applies to allegations of loss causation, the Court finds that Plaintiffs have adequately, albeit barely, pled loss causation as to this issue. Plaintiffs have given Defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm. Inc.*, 544 U.S. at 346 (*quoting Conley,* 355 U.S. at 47). Although the analyst reports addressed issues in addition to TECO's possession of merchant power contracts, Plaintiffs "need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; he need only show that it was "substantial," i.e., a significant contributing cause." *Robbins*, 116 F.3d at 1447.

 As set forth below, however, the Court finds that this is the only point as to which Plaintiffs have pled loss causation.

*2. Transmission access*

The September 3, 2003 CSFB report stated that it was *not clear* whether TECO had secured any transmission access in the region for the Gila River Project in Arizona. (Dkt. 90, ¶ 207). Plaintiffs have alleged no report disputing TECO's later contentions in September that it applied for

transmission access and that it had transmission access to the market in Arizona.[10]

### 3. Exposure to Panda's debt

Plaintiffs allege that Panda's ability to turn over ownership to TECO was negotiated "unbeknownst to TECO's shareholders." (Dkt. 90, ¶ 68). However, the Amended Complaint itself alleges that TECO's 2001 10-K reported that "The [Union and Gila River project] purchase arrangement can result in TPS's purchase of the interest prior to 2007 under certain circumstances, including Panda's default under a bank loan made to Panda using the purchase arrangement as collateral." (Dkt. 90, ¶ 185). The 2001 10-K also stated as to the TIE projects that "[u]nder certain circumstances, among which are additional capital investments by TPS, this loan could give TPS an ownership interest in these projects in late 2002." (Dkt. 90, ¶ 186).

Plaintiffs' allegation that these provisions were negotiated "unbeknownst to shareholders" is conclusory. That the analyst reports later noted the likelihood that TECO would assume Panda's ownership interest does not reveal a fraud on the market. The reports merely predict the likelihood of a future event.

### 4. Exposure to Enron's collapse

Plaintiffs have alleged no corrective disclosure or other revelation of any "truth" regarding TECO's exposure to the Enron collapse.

### 5. Ability to maintain dividends

Plaintiffs allege that TECO repeatedly stated that it was dedicated to maintaining the dividend. (Dkt. 90, ¶¶ 216, 221, 314-15). Plaintiffs allege that analyst reports conflicted with these statements. For instance, the September 3, 2002 report from Jefferies stated that TECO's unhedged

---

[10] The August 16, 2002 analyst report states that less than half of the capacity in Arizona has contracted transmission rights, implying that TECO actually did have grid access in Arizona. (Dkt. 97-5, Exh. 19).

generation portfolio increased the "uncertainty of the dividend continuing at its current level." (Dkt. 90, ¶ 210).  On February 4, 2003, Morgan Stanley downgraded the stock and stated that a dividend cut was "a strong likelihood[] as spark spreads have continued at very low levels, in our opinion." As this Court previously found, these statements constituted analysts' predictions, not corrective disclosures.  Furthermore, even if this "risk" were considered to have "materialized" on April 11, 2003 when the dividend was finally cut, there was no accompanying loss to the Plaintiffs -- the stock price increased.  That the analyst reports at issue in this case are cautionary and pessimistic on the subject of TECO maintaining the dividend is undisputed.  However:

> [i]f downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses. That would effectively convert the securities laws into an insurance policy for investors. *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d at 266-67.

### *Conclusion*

As Plaintiffs have sufficiently pled loss causation only with respect to the August 13, 2002 and September 3, 2002 disclosures, Defendant's motion to dismiss is granted in part.  Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss (Dkt. 100) is **GRANTED IN PART**, as set forth herein. Leave to amend will be considered on motion of Plaintiffs.

**DONE AND ORDERED** in chambers this 10th day of October, 2006.

/s/James D. Whittemore
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

16